Filed 1/27/26  In re C.G. CA4/2
See Dissenting Opinion

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re C.G., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E086423 |
| Plaintiff and Respondent, | (Super.Ct.No. J301252) |
| v. | OPINION |
| I.G., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Annemarie G. Pace, Judge.  Reversed and remanded.

Kristen L. Sellers, under appointment by the Court of Appeal, for Defendant and Appellant.

1

Laura Feingold, County Counsel, and Landon Villavaso, Deputy County Counsel, for Plaintiff and Respondent.

At a Welfare and Institutions Code section 366.26[1] hearing, the juvenile court terminated the parental rights of defendant and appellant I.G. (father) as to C.G. (minor, born December 2023). On appeal, father contends the court erred in declining to apply the beneficial parental relationship exception to termination of parental rights. We reverse and remand the matter.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On June 11, 2024, personnel from plaintiff and respondent, the San Bernardino County Children and Family Services (the department), received an immediate response referral alleging physical abuse and general neglect of minor by parents.[2] Parents brought minor to the hospital with a leg injury. Parents reported that minor had fallen over while placed in a car seat on the couch. The physician reported that minor's injuries were inconsistent with parents' story.

An X-ray of minor's leg reflected minor had "an acute obliquely oriented laterally displaced fracture on the right distal femur." A nurse reported that a common cause for such a fracture would involve "'somebody breaking it, not many things babies can do to break their femur, it would have to be a high fall or traumatic use of force.'"

---

[1] All further statutory references are to the Welfare and Intuitions Code unless otherwise stated.

[2] Father was 22 years old at the time of the referral; mother was 21 years old.

The responding officer reported that parents said minor "'fell a three-foot fall'"; they blamed the injury on the massage therapist they called to treat minor.[3] The officer believed the family had rehearsed the story.

The social worker interviewed parents separately. Father reported that on June 9, 2024, he placed minor on the edge of the couch in her car seat. Between five to 10 minutes later, they heard a crash. Minor had fallen out of the car seat onto the ground. Father did not observe any marks or bruises.

Following the incident, minor became fussy and had trouble sleeping. The paternal grandmother recommended they call a masseuse to treat minor. They did so. The masseuse massaged minor's fontanelle, which parents believed caused minor's symptoms.

On June 11, 2024, mother informed father that minor's right leg appeared swollen. They brought minor to the hospital, where she was transferred to Loma Linda for further treatment.

Mother "reported a similar sequence of events regarding the child's injury from the fall and disclosed she believed the masseuse the family had hired injured the child during the procedure." "When asked why she and the father did not take the child to the emergency room sooner, the mother reported she believed the child did not incur any serious injuries at the time of the incident, as no marks or bruising were observed at the

---

[3] "[P]arents had hired a massage therapist who specialized in home remedy treatments of 'Caida de la Mollera[,]' otherwise known as a 'fallen fontanel.' It was discussed the family held a cultural belief . . . that the child's symptoms . . . could be remedied with this procedure."

3

time. The mother reported it was not until June 11 that the child was observed as having a swollen leg and [they were] advised by the paternal grandmother to take the child to the emergency room for treatment." The paternal grandmother reported the same series of events.

The masseuse reported she had been hired by parents after minor fell from a chair; parents said minor had a reduced appetite and was fussy. The masseuse "reported the child was observed to be crying a lot and had observed the child's fontanel had fallen and become misplaced. [She] reported she massaged the child's stomach to address [her] indigestion and [her] fontanel to coax it back into place. [She] denied ever massaging the child's limbs or smacking their feet as disclosed by the paternal grandmother. [She] reported the child was already injured when she had arrived and expressed concern about the parents implicating[] she had injured the child."

A forensic physician "found evidence of intercranial bleeding which was consistent with physical abuse." He "reported the various explanations provided by the parents were inconsistent [with] the child's observed injuries." The doctor "reported [that] had the child been injured after the fall and been massaged by the masseuse that same night, the child would have been in excruciating pain due to the severity of the child's fracture, citing this inconsistency as further concerns the child had been physically abused in a manner not disclosed by the parents."

The social worker obtained a detention warrant and took minor into protective custody on June 13, 2024. "On June 14, 2024, the [social worker] received a forensic

4

medical report from . . . the Children's Assessment Center [CAC]. The report contained a diagnosis of a 'right distal femur transverse, mildly displaced, fracture with regional soft tissue edema.' The report further provided an update to the initial impression of intercranial bleeding, stating, 'upon further imaging . . . no intercranial bleeding was appreciated.' The findings reported by [the physician] regarding the displaced femur fracture were that type of fracture 'is caused by a bending force as the leg is grabbed or forcefully manipulated. The history provided of a short fall onto carpeted flooring does not explain [minor's] injury. This injury is most consistent with physical abuse.'"

On June 17, 2024, the department filed a section 300 juvenile dependency petition alleging that minor was found to have sustained multiple, nonaccidental injuries while in mother's care, and that mother's explanations were inconsistent with the injuries (a.1, b.3, & e.5), and that minor was found to have sustained multiple, nonaccidental injuries while in father's care, and that father's explanations were inconsistent with the injuries (a.1, b.4, & e.6). On June 18, 2024, the court detained minor.

In the July 11, 2024, jurisdiction and disposition report, the social worker recommended the court find the allegations in the petition true, remove minor from parents' custody, and deny them reunification services pursuant to section 361.5, subdivision (b)(5) (severe physical abuse to a child under the age of 5). Mother reported "that she thought [when] the masseuse was massaging [minor's] leg . . . she pulled it hard." However, mother admitted she did not see the masseuse do so. Mother said, "that there was no physical abuse, and that there was just an accident."

Pursuant to a structured team decision making safety assessment, there was a very high risk of injury to minor if she remained in parents' custody. Department personnel had placed minor in the care of her maternal grandmother. Parents visited minor weekly for two and a half hours. The visits went well. The social worker concluded that parents' explanations failed to account for the severity of minor's injury; thus, their failure to accept responsibility required removal of minor from their custody.

In the August 21, 2024, additional information for the court, the social worker attached the CAC's medical report. The report reflected that minor's injury was "caused by a bending force as the leg is grabbed or forcefully manipulated. The history provided of a short fall onto carpeted flooring does not explain [minor's] injury. This injury is most consistent with physical abuse."

"The parents are currently engaged in parenting classes and individual therapy and report services are going well. Visits are taking place once a week for two hours . . . . No concerns have been noted during visits and the caregiver reports that the parents are appropriate during visits and bonding with the child."

In the information for the court filed on October 2, 2024, the social worker reported that mother had completed her parenting class and therapy, though mother had yet to give department personnel her certificates of completion. Mother reported that father had "enrolled in parenting and counseling however he has not completed these classes." Parents visited consistently with minor and "there are no problems."

6

In the information for the court filed on November 6, 2024, the social worker reported that she had increased parents' supervised visits to four hours weekly. "[T]here have not been noted concerns during the visits." Father successfully completed a 12-week nurturing parenting course.

In the addendum report filed November 8, 2024, the social worker reported that the maternal grandmother was providing for all minor's needs. It was apparent that minor was attached to the maternal grandmother and looked to her to be comforted.

In the addendum report filed December 3, 2024, a physician posited, "An untreated femur fracture would place the child at risk for limb length discrepancy, leg deformity, and abnormal motor development. Limb length discrepancy and leg deformity are serious, permanent consequences. All of the possible outcomes require close medical follow-up."

In the addendum report filed December 11, 2024, the social worker reported that parents' visits with minor had been reduced to two hours weekly. The social worker noted that parents had completed their services, but their explanations were still not consistent with minor's injuries.

At the jurisdiction and disposition hearing on January 14, 2025, a physician who examined minor on June 11, 2024, testified minor had sustained a right femur "fracture[, which] is caused by a bending or a twisting force applied directly to the bone of the upper leg." "I felt her injury was most consistent with physical abuse." In her opinion, there

was no reasonable way minor could have sustained the injury by normal handling or by an accident such as falling from a couch to the floor.

"Fractures like this have been described in cases such as motor vehicle [collisions]. Pedestrian versus auto collisions, those sorts of things." "After an injury like this she would have been in a lot of pain." If left untreated, minor's injuries could have resulted in "permanent disabilities."

The court found the allegations in the petition true;[4] removed minor from parents' custody; denied them reunification services pursuant to section 361.5, subdivision (b)(5); and set the section 366.26 hearing. Parents filed notices of intent to file petitions for extraordinary writ. This court dismissed the petitions for failure to file the writ petitions.

In the May 1, 2025, section 366.26 report, the social worker recommended the court find minor adoptable and terminate parents' parental rights. Parents continued to consistently visit with minor for two hours weekly. The maternal grandmother reported that parents had positive engagement with minor. The social worker noted she had observed visits wherein minor would smile and attempt to talk to parents as they talked to her. "The parents encourage [minor] to sing by singing along to the music and clapping. [Minor] enjoys being carried by her mother. Both parents have been visiting together and have not missed any visits during this reporting period."

Department personnel placed minor with the maternal grandmother on June 13, 2024. "The [minor] and her prospective adoptive maternal grandmother . . . share a

---

[4] The court struck the words "multiple injuries" from the allegations.

8

mutual bond and attachment. [The maternal grandmother] has stated that she is willing to do whatever it takes to keep [minor] within the family and expressed the desire to adopt [minor]."

At the section 366.26 hearing on June 27, 2025, father testified that minor was attached to him prior to her removal by the department. He visited weekly with minor for two hours and had not missed any visits. At the beginning of visits, minor "gets super excited. She learned how to walk now, so she'll walk and she'll run towards me and she'll call me 'Dada' and she'll hug me and my wife as well. [¶] So she'll . . . jump on top of me and get excited that I'm there to see her." Minor was "teaching me how to give kisses now, so she comes out of random and just give me a kiss and go back to whatever she's playing with."

"When . . . we're getting ready to leave, she'll notice that my wife will grab her bag and I'll start getting up. And she'll know that we're leaving and she'll be like, 'No, no, no.' And returns to me and tries to grab me. [¶] And she'll tell her grandmother, like, 'Bye', you know, because she wants to leave with us. And she just gets very—she just gets very sad and emotional and starts crying. She doesn't want us to leave."

"And, like I said, when it's time for us to leave she doesn't want us to leave at all. She'll cry hysterically. And there's times where her grandmother sometimes has to call us over the phone so we can calm her down and, like, let her know that we'll be here again at the next week and we'll be here for her."

9

Minor looked to him as her father. Father believed minor would suffer emotionally if she was unable to have continued contact with him. Father loved minor "so much." He took "full responsibility [for] the accident. And I want to do everything I can to be part of her life. I really want to be part of her life and I feel she needs us to be part of her life as well." Parents contributed about $300 to $400 for minor's maintenance each month.

Mother testified that father was present in the hospital on the day minor was born. After minor was born, mother had support from the maternal grandmother. Parents were the sole financial support for minor during her first five months of life. During visits, mother "and . . . father do take turns to be able to spend some more quality time with her by ourselves." She believed minor looked to parents as her mother and father. Minor gets upset when their visits are coming to an end, "Usually she will cry, so my grandmother will call me to be able to call her and I will have to speak to her and tell her—you know, soothe her a little bit and say it's okay and that I'll be back again."

Parents' counsel argued that the beneficial relationship exception to termination of parental rights applied. Minor's counsel argued that although parents had visited consistently with minor and that minor "has a positive emotional attachment to the parents," neither parent had shown the kind of attachment implying that the child would benefit from continuing the relationship. Thus, he contended parents could not show that severing that relationship would be detrimental to minor.

10

Counsel for the department agreed that parents visited regularly and consistently with minor. However, the department also maintained that neither parent had shown the kind of attachment which would imply that minor would benefit from continuing the relationship. Therefore, parents failed to show that severing their relationship with minor would be detrimental to minor, and the court should terminate their parental rights.

The court found that minor was adoptable. The court further found that parents had regular visitation and contact with minor; "they haven't missed a visit throughout the life of the case."

However, the court also found that although minor "has a positive reaction and attachment to her parents . . . I also question how substantial that is from her perspective. I don't think anybody doubts that the parents love her very much, as I heard from everybody today, and that she does have a positive relationship with them. [¶] But we do have to look at it from her perspective and take into account that she was removed from them at five months old. She is now a year and a half old and has spent a year in the care of her grandmother who provides the day-to-day care for her. [¶] And, while the parents clearly have a substantial positive emotional attachment to [minor], I don't believe that it is substantial from [minor's] perspective, while very positive."

With respect to whether termination of parental rights would be detrimental to minor, the court found "that the benefits of adoption far outweigh any detriment that

11

[minor] would suffer by the termination of parental rights, so I am going to terminate parental rights."[5]

## II. DISCUSSION

Father contends the court erred in declining to apply the beneficial parental relationship exception to termination of parental rights. We hold that the court erred in its analysis of whether minor had a beneficial relationship with father. Thus, the court could not have conducted a proper analysis of detriment. Therefore, the matter must be reversed and remanded for a proper determination of the beneficial relationship and detriment prongs of the exception.

"[T]he goal at the section 366.26 hearing is 'specifically . . . to select and implement a permanent plan for the child.' [Citations.] To guide the court in selecting the most suitable permanent arrangement, the statute lists plans in order of preference and provides a detailed procedure for choosing among them. [Citation.] According to that procedure, the court must first determine by clear and convincing evidence whether the child is likely to be adopted. [Citation.] If so, and if the court finds that there has been a previous determination that reunification services be terminated, then the court shall terminate parental rights to allow for adoption. [Citation.] But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent

---

[5] The court asked counsel to discuss a "post-adoption contact with the maternal grandmother. I also don't oppose even post-termination visitation continuing if it's in [minor's] best interest."

12

plan. [Citation.] As we have previously explained, '[t]he statutory exceptions merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.'" (*In re Caden C.* (2021) 11 Cal.5th 614, 630-631 (*Caden C.*).)

"The exception at issue in this case is limited in scope. It applies where '[t]he court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.' [Citation.] From the statute, we readily discern three elements the parent must prove to establish the exception: (1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 631.) It is the parent who must prove all three elements by a preponderance of the evidence; the parent must "show a '*compelling* reason for determining that termination would be detrimental to the child . . . .'" (*Id.* at p. 635.)

Here, father contends that he maintained regular visitation with minor. We agree. The reports reflect that father consistently visited with minor. In fact, father testified, and the court found, that he never missed a visit with minor. Moreover, minor's counsel and counsel for the department agreed that father visited minor regularly. Finally, the court found that father met this prong. Thus, we address only the second and third prongs, beneficial relationship and detriment.

13

*1. Beneficial Relationship.*

Father contends the court erred in finding that father and minor did not share a beneficial relationship. We agree.

On the second element, "the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) Courts "assess whether 'the child would benefit from continuing the relationship.' [Citation.] Again here, the focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Id.* at p. 632.) "[C]ourts often consider how children feel about, interact with, look to, or talk about their parents. [Citations.] Doing so properly focuses the inquiry on the child, . . ." (*Ibid*.)

We review whether there is a beneficial relationship for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at p. 639; *In re I.E.* (2023) 91 Cal.App.5th 683, 691; *In re Dy.P.* (2022) 76 Cal.App.5th 153, 165.) "[I]n assessing visitation and the relationship between parent and child, the court must make a series of factual determinations. These may range from the specific features of the child's relationship with the parent and the harm that would come from losing those specific features to a higher-level conclusion of how harmful in total that loss would be. The court must also determine, for the particular child, how a prospective adoptive placement may offset and even counterbalance those

14

harms.  In so doing, it may make explicit or implicit findings ranging from specific benefits related to the child's specific characteristics up to a higher-level conclusion about the benefit of adoption all told.  All these factual determinations are properly reviewed for substantial evidence." (*Caden C.*, at p. 640.)

Insufficient evidence supports the court's finding that father did not establish his burden of proving that minor did not have a substantial, positive, emotional attachment to father, such that minor would benefit from continuing the relationship.  The court's determination that minor did not have a substantial relationship with father was erroneously based solely on the basis that minor was removed from parents when she was five months old and had been in the maternal grandmother's care for over a year.[6]

While "'[t]he age of the child, [and] the portion of the child's life spent in the parent's custody,'" are appropriate factors to consider, the court must also evaluate "'the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)  "[C]ourts [should] consider how children feel about, interact with, look to, or talk about their parents.  [Citations.]" (*Ibid.*)  Courts should look at "the specific features of the child's relationship with the parent . . . ." (*Id.* at p. 640)

Here, the court did not evaluate the latter factors at all, focusing exclusively on minor's age and time spent in the maternal grandmother's custody.  Thus, the court effectively established a rule whereby a parent whose child was removed at such an age

---

[6] The court made no credibility determinations regarding parents' testimonies.

would never be able to establish the second prong of the *Caden C.* test.  Therefore, the court did not conduct the proper analysis of whether minor had a substantial attachment to father, such that she would benefit in continuing the relationship.  (*In re M.V.* (2023) 87 Cal.App.5th 1155, 1185 [Court erred where it failed to evaluate the quality of the parent-child relationship and the positive or negative effects of the interaction between them].)

As noted *ante*, father visited minor consistently, and he never missed a visit.  Reports indicated all the visits went well.

In one report, the social worker noted, "the caregiver reports that the parents are appropriate during visits and bonding with the child."  The maternal grandmother later reported that parents had positive engagement with minor.  The social worker observed visits wherein minor would smile and attempt to talk to parents as they talked to her.  "The parents encourage [minor] to sing by singing along to the music and clapping."  Mother testified that she and father would take separate turns with minor during visits so that they could each have individual quality time with her.

Father testified that minor was attached to him prior to her removal by the department.  Both parents testified that that minor looked to father as her father.  Father believed minor would suffer emotionally if she was unable to have continued contact with him.

Father testified that at the beginning of visits, minor would get "super excited."  She would walk toward him and call him "'Dada.'"  Minor would spontaneously kiss father.

16

Both parents testified minor would get upset when the visits ended. Father testified that when he would get ready to leave, minor would say "'No, no, no.'" She would get very sad and emotional and "cry hysterically." We note that neither minor's counsel nor counsel for the department cross-examined parents or put on other witnesses to dispute parents' testimony; thus, their testimonies were uncontradicted.

Minor's counsel noted that minor had a positive emotional attachment to father. The court found that minor had a positive attachment to and "very positive" relationship with father. The court found parents had a substantial positive emotional attachment to minor. Immediately upon terminating father's parental rights, the court asked counsel to discuss a post-adoption contact with the maternal grandmother to ensure continued visitation between minor and parents.

Thus, insufficient evidence supports the court's finding that the minor did not have a beneficial relationship with father. Father established his burden of proving that minor had a substantial, positive, emotional attachment to him.

At oral argument, the department argued that to establish a beneficial relationship, "there needs to be something more that bridges the gap between a friendly visitor . . . and a parent-child relationship," citing *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1315 ("'The relationship arises from day-to-day interaction, companionship and shared experiences'").

However, just as *Caden C.* held that "it is paradoxical to conclude 'that the [beneficial relationship] exception can only apply when the parent has made sufficient progress in

addressing the problems that led to dependency" (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 318), it would be just as paradoxical to argue, as the department did at oral argument, that the beneficial relationship can only apply if the parent had daily interaction with a child, with respect to whom they have long since lost custody and services.  (*Ibid*. ["Courts must keep in mind that the benefits a child derives from her relationship with such a parent, whose presence in the child's life is often limited to supervised visitation, are typically much subtler than the benefits the child could expect from a custodial parent"].)

The department's contention that father and minor must occupy a parent-child relationship for the court to find they have a beneficial relationship was effectively overruled by *Caden C.*  (*In re M.G.* (2022) 80 Cal.App.5th 836, 852 ["The focus is not on whether [the minor's] parents can assume their parental roles; as *Caden C.* reminded us, that ship sailed when reunification services were terminated and the section 366.26 hearing was set"]; *In re A.L.* (2022) 73 Cal.App.5th 1131, 1137 ["a parent seeking to apply the parental-benefit exception need not show that he or she occupies a parental role in the child's life"]; *In re Katherin J.* (2022) 75 Cal.App.5th 303, 309; *In re M.V.* (2025) 109 Cal.App.5th 486, 515.)  Moreover, as discussed *ante*, the parents' uncontradicted testimony established that father did occupy a parental role in minor's life.  For example, both parents testified that that minor looked to father as her father.

The department, citing *In re E.H.* (2003) 108 Cal.App.4th 659 (*E.H.*), argues father's lack of accountability for minor's injury undermines any positive attachment that he and

18

minor could have; however, that assumes that father was the one who injured minor; that if he was the one who injured minor, he could not have reformed and mended the relationship; or that minor even remembers the incident.  Moreover, the court and minor's counsel already conceded that father and minor had a positive relationship.

Furthermore, *E.H.* stands for the proposition that where the parents reasonably should have known that a child was being harmed by someone in the home, the court can sustain a section 300, subdivision (e) allegation against them, regardless of whether they both disavow any knowledge of how the injuries were sustained.  (*E.H.*, *supra*, 108 Cal.App.4th at p. 670.)  It does not support the department's argument that such a person could never establish a beneficial relationship with that child.  The department effectively posits rules whereby a parent who injured a child or reasonably should have known that someone in the home injured the child or a parent for whom the court merely declined to grant daily visitation becomes per se ineligible to preserve any relationship with that child.  That is not the law.  In such instances, there would be no need to apply the *Caden C.* factors at all.

### 2. *Detriment*

Father contends the court erred in finding there would be no detriment to minor in terminating father's parental rights.  We hold that because the court erred in its analysis of whether minor had a beneficial relationship with father, the court could not have conducted a proper analysis of detriment.  (*In re M.G.*, *supra*, 80 Cal.App.5th at p. 852 ["Given our ruling that substantial evidence does not support the finding of 'no bond,' it

is unnecessary for us to review the trial court's findings as to the third element"]; *In re M.V.*, *supra*, 87 Cal.App.5th at p. 1185 ["The court's lack of analysis of the second element left it unable to perform the weighing required by the third element, . . ."].) Thus, the matter must be reversed and remanded for a proper determination of both beneficial relation and detriment.

"[I]n assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home. [Citation.] By making this decision, the trial court determines whether terminating parental rights serves the child's best interests." (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) "Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Id.* at p. 633.) "[T]he question is just whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Id.* at p. 634.)

"[W]hether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) "A court abuses its discretion only when ""the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.""" [Citation.] But ""[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.""" (*Id.* at p. 641.)

Here, because the court erred in determining that minor did not have a beneficial relationship with father, the court could not and did not conduct the proper analysis in determining whether severing that relationship would be detrimental to minor. This is because the determent prong focuses on the harm of severing minor's *relationship* with father. The court's incomplete analysis of whether minor had a beneficial relationship with father, means that it could not have properly evaluated whether severing that relationship would be detrimental to minor. Thus, the matter is reversed and remanded for the court to conduct a proper analysis of the beneficial relationship and detriment prongs.

### III. DISPOSITION

The order terminating father's parental rights is reversed. The matter is remanded for the court to conduct a new section 366.26 hearing, consistent with the views expressed herein. At that hearing, the juvenile court may consider "facts and circumstances that have arisen since the filing of this appeal." (*In re Mia M*. (2022) 75

Cal.App.5th 792, 814; *In re Hunter S.* (2006) 142 Cal.App.4th 1497, 1508 ["given the passage of time . . . it may be appropriate for the juvenile court to . . . consider. . . the circumstances . . . in light of current information"]; *In re Korbin Z.* (2016) 3 Cal.App.5th 511, 519.)

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER_____
Acting P. J.

I concur:

MILLER_____
J.

[*In re C.G.*, E086423]

MENETREZ, J., Dissenting.

Appellant I.G. (Father) argues that we should reverse the termination of his parental rights to his daughter, C.G., because the juvenile court erroneously failed to apply the beneficial parental relationship exception under Welfare and Institutions Code section 366.26, subdivision (c)(1)(B)(i). I disagree and would affirm.

Under the beneficial parental relationship exception, the parent bears the burden of proving three elements by a preponderance of the evidence. (*In re Caden C.* (2021) 11 Cal.5th 614, 636 (*Caden C.*).) First, the parent must show regular visitation and contact with the child. (*Ibid.*) Second, "the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Ibid.*) Third, the parent must show that the termination of parental rights "would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Ibid.*)

We review the juvenile court's findings on the first two elements for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-640.) Whether termination of parental rights would be detrimental to the child because of the beneficial parental relationship is a discretionary determination and hence is reviewed for abuse of discretion. (*Id.* at p. 640.) But we review any factual findings underlying that decision for substantial evidence. (*Ibid.*)

1

The juvenile court found in favor of Father on the first element, which was and remains uncontested. But Father challenges the court's adverse findings on the second and third elements.

Father argues that "substantial evidence supports finding" in his favor on the second element. (Boldfacing and capitalization omitted.) That is a misapplication of the standard of review. In order to prevail, Father must show that the juvenile court's adverse finding is not supported by substantial evidence, not merely that the record contains evidence that would support a favorable finding. (*In re Marriage of M.P. & M.C.* (2025) 116 Cal.App.5th 1096, 1107 [""If substantial evidence supports the judgment, reversal is not warranted even if facts exist that would support a contrary finding""].)

Father has not made and cannot make the required showing.[1] The juvenile court found that C.G. had a positive emotional attachment to Father but that it was not substantial, which *Caden C.* requires. That is a reasonable interpretation of the evidence, because it was reasonable to interpret the evidence as showing that Father's relationship with C.G., although positive, was merely that of a "'friendly visitor.'" (*In re Helen W.* (2007) 150 Cal.App.4th 71, 81.) Because the evidence does not compel a finding in Father's favor, his challenge to the court's ruling on the second element fails.

_____

[1] Technically, because Father had the burden of proof and the juvenile court determined that he failed to carry it, what Father must show on appeal is that the evidence was so strong, uncontradicted, and unimpeached as to compel a finding in his favor as a matter of law. (*In re Raul V.* (2022) 82 Cal.App.5th 290, 300-301; *In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.)

The juvenile court's references to C.G.'s age and the small portion of her life that she had spent in Father's custody were entirely proper. The Supreme Court has identified those factors as relevant to the second element. (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

The juvenile court's suggestion that the parties explore options for posttermination or postadoption contact between Father and C.G. likewise does not support Father's position. The existence of postadoption visitation agreements reflects that sometimes termination of parental rights is appropriate even though continuing contact between the child and one or both biological parents would benefit the child. The court's suggestion that this might be such a case has no tendency to show that the termination of parental rights was erroneous.

Because Father has failed to show error with respect to the second element, we need not address the third. But Father's argument concerning the third element fails for similar reasons. It was reasonable for the juvenile court to conclude that because Father's relationship with C.G., although positive, was not substantial, any detriment caused by the termination of that relationship would not outweigh the very substantial benefits that C.G. would gain through adoption. The court therefore did not abuse its discretion by ruling against Father on the third element. (*Caden C.*, *supra*, 11 Cal.5th at p. 641 [a trial court abuses its discretion only "'"'by making an arbitrary, capricious, or patently absurd determination,'"'" and "'"'[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court'"'"].)

For all of the foregoing reasons, I would affirm the termination of parental rights.

I therefore respectfully dissent.

MENETREZ
J.